UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

KEYSTONE CAPITAL PARTNERS, INC.
d/b/a FEDERAL EMPLOYEE BENEFIT
COUNSELORS, CHRISTOPHER S.
LAWS, JONATHAN DAX COOKE,
DANNY S. HOOD, and BRANDON P.
LONG,

Defendants.

Civil Action File No.

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.      Between approximately March 2012 and November 2014, (the "Relevant Period"), Christopher Laws, Jonathan Cooke, Danny Hood, and Brandon Long, each of whom were registered representatives of a broker dealer

(collectively, the "Representatives"), fraudulently induced federal employees to rollover significant funds from their federal retirement accounts, referred to as Thrift Savings Plan ("TSP") accounts, into variable annuity products promoted under the banner of an entity called Keystone Capital Partners, Inc. d/b/a Federal Employee Benefits Counselors.

2.      Motivated by the prospect of high commissions associated with the variable annuities, the Representatives targeted federal employees, age 59 ½ and over, who had significant TSP account holdings that could be rolled over on a tax-free basis into variable annuities held in qualified plans at annuity carriers.

3.      Defendants employed several tactics calculated to mislead federal employees into believing that Defendants and their recommended investment (that is, a variable annuity) were affiliated with or approved by the federal government.  For example, despite the fact that their recommended investments had no connection to the TSP,  the Representatives, in recommending this investment: (a) made misleading comparisons between their recommended investment and the life annuity offered through the TSP by omitting key information or falsely describing the actual fee structure and surrender fees related to their recommended investment; (b) used an eagle-encircled insignia on

other documents given to customers and on their website that resembled the official seal of various agencies of the federal government; and (c) used a name, Federal Employee Benefits Counselors, that insinuated that they were affiliated with the federal government while obscuring the fact that they were associated with a broker dealer.

4.    Further adding to the false impression that their investment was affiliated with or approved by the TSP, the Representatives combined into one form the documents the Representative needed to purchase the variable annuity with the portions of the official TSP Form that was needed to transfer funds from the federal employees' TSP accounts, and referred to the variable annuity investment using terminology from an official TSP form.

5.    In truth, the variable annuities that Defendants offered and sold were privately-issued, separate and apart from the TSP and the federal government, and had much higher costs than alternatives available through the TSP.  Moreover, the Representatives had no affiliation with, and were not approved or vetted by, the federal government.

6.    The promotional materials that Defendants gave to potential investors also touted the additional benefits of the investment option they

recommended as compared to the life annuity offered through the TSP, without disclosing the significantly higher annual fees and surrender charges.

7.     During the Relevant Period, Defendants sold approximately 200 variable annuities with a total face value of over approximately $40 million to federal employees, who used monies rolled over from their TSP accounts to fund their purchases, and the Representatives collectively earned approximately $1.7 million in commissions on these sales.

8.     In connection with at least five of these sales, Defendants Hood and Long made additional oral misrepresentations or omissions further suggesting that the investment option they recommended was affiliated with the TSP, and misrepresented or omitted to disclose the associated fees.

9.     Further obscuring that Defendants and their recommended investments were unaffiliated with the TSP and the federal government, some of the Defendants also opened accounts with their broker dealer in these five investors' names without the investors' knowledge or consent.

10.     The broker dealer that employed the Representatives required that an account be opened in an investor's name before the Representatives could place a variable annuity order on the investor's behalf.  But some of the investors

did not learn of the creation or existence of these accounts in their names until after their TSP accounts had been liquidated (that is, the underlying securities were sold) and the funds transferred to purchase the variable annuity.

11.     Defendants also did not give these five investors the prospectuses for those investments, even though this was required by the broker dealer that employed the Representatives.  This also veiled the fact that the investment option they recommended to these investors was a variable annuity issued by a private insurance company that had no connection to, and had not been specifically approved or vetted by, the TSP or the federal government.

## JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].

13.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].

14.     In connection with the transactions, acts, practices, and courses of business described in this Complaint, Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce, of the mails, and/or of the means and instruments of transportation or communication in interstate commerce.

15.     Venue is proper in this district as all defendants reside in this district.

## FACTS

**A.     Defendants**

16.     **Federal Employee Benefit Counselors ("FEBC") is a d/b/a of Keystone Capital Partners, Inc.**, which is a Georgia-registered corporation that was cofounded by Christopher Laws and Jonathan Cooke in early 2012. From its inception until December 2014, FEBC's office was located in the same office in Alpharetta, Georgia as the Office of Supervisory Jurisdiction ("OSJ") for the broker dealer with whom the Representatives were registered (the "Broker Dealer").  Christopher Laws was the manager of this office (the "Alpharetta OSJ").

17.     **Christopher S. Laws ("Laws")**, age 49, lives in Alpharetta, Georgia.  From July 2005 to December 2014, Laws was a registered representative with the Broker Dealer, and at least as early as 2006, he was the manager of the Broker Dealer's Alpharetta OSJ.  Laws co-owns FEBC with Jonathan Cooke, and during the Relevant Period, was the entity's CFO and Secretary.  In December 2014, Laws was terminated from the Broker Dealer. From that time until March 2017, Laws was a registered representative with another broker dealer.  On or about March 31, 2017, Laws was permitted to resign from that broker dealer when that firm terminated its relationship with the branch office from which Laws had operated.

18.     **Jonathan Dax Cooke ("Cooke")**, age 34, lives in Atlanta, Georgia.  From May 2009 to December 2014, Cooke was a registered representative with the Broker Dealer in the firm's Alpharetta OSJ.  Cooke co-owns FEBC with Laws, and, during the Relevant Period, was the entity's CEO.  In December 2014, Cooke was terminated from the Broker Dealer.  From that time until the voluntary termination of his registration in December 2016, Cooke was a registered representative with another broker dealer.

19.    **Brandon Preston Long ("Long")**, age 28, lives in Atlanta, Georgia.  From April 2014 to December 2014, Long was a registered representative with the Broker Dealer in that firm's Alpharetta OSJ.  In December 2014, Long was terminated from the Broker Dealer.  From that time until March 2017, Long was a registered representative with another broker dealer.  On or about March 31, 2017, Long was permitted to resign from that broker dealer when that firm terminated its relationship with the branch office from which he had operated.

20.    **Danny Scott Hood ("Hood")**, age 44, lives in Marietta, Georgia.  From October 2012 to December 2014, Hood was a registered representative with the Broker Dealer based in the firm's Alpharetta OSJ.  In December 2014, Hood was terminated from the Broker Dealer.  From December 2014 to August 2015, Hood was a registered representative with two other brokerage firms, and with respect to one of those firms, was an investment adviser representative for the affiliated investment adviser.  Since August 2015, Hood has been an investment adviser representative with an investment adviser that is registered with the Commission.

**B.    Other Relevant Entity**

21.    The Broker Dealer is a California corporation headquartered in Boston, Massachusetts and is dually registered with the Commission as a broker-dealer and an investment adviser.  During the Relevant Period, all of the variable annuity sales at issue were processed through the Broker Dealer's Alpharetta OSJ, of which Laws was the manager.

**C.    FEBC's Origins and Treatment as an Outside Business Activity**

22.    In early 2012, Laws and Cooke founded FEBC as a "doing business as" name for Keystone Capital Partners, Inc.  As co-owners of FEBC, Laws served as FEBC's CFO and Secretary, and Cooke served as the company's CEO.

23.    During the Relevant Period, FEBC was based in the same location as the Broker Dealer's Alpharetta OSJ from which Laws (the OSJ manager), Cooke, Hood and Long conducted securities transactions as the Broker Dealer's registered representatives.

24.    Under the Broker Dealer's applicable policies, registered representatives were required to provide written notice to the Broker Dealer of any intended outside business activity ("OBA"), and they were required to

obtain written approval from the Broker Dealer before engaging in the proposed activity.

25.     In or around March 2012, Laws and Cooke disclosed FEBC to the Broker Dealer's Advisor Review Group as an OBA.  In doing so, however, they falsely characterized FEBC as a non-securities related entity that sold only fixed or non-variable insurance products.  The Broker Dealer's Advisor Review Group gave Laws and Cooke written approval to operate FEBC as a non-securities OBA that the firm had no obligation to supervise under FINRA Rule 3040 (current Rule 3280).

**D.     Background on the TSP Program and Relevant Withdrawal Options**

26.     The federal government offers its employees a tax-deferred retirement savings account which is akin to a 401(k) program.  That program is referred to as the Thrift Savings Plan or "TSP."

27.     Upon leaving federal service, federal employees have three options for making a full withdrawal of their entire TSP account, any two or three of which can be combined:  (1) a single payment, (2) a series of monthly payments spread out over time, and (3) as a TSP life annuity, which the TSP purchases on behalf of the TSP participant from the TSP's annuity vendor.  The

TSP life annuity provides a monthly benefit paid to the employee for life and, if the employee chooses, for the life of a designated survivor.

28.      To purchase the life annuity, the former employee must complete a "Form TSP-70," as a request for a full withdrawal from the TSP, and select the "life annuity" option within the "Withdrawal Election" section of that form.

29.      Current federal employees age 59 ½ or older who are not planning an immediate separation from federal service have the option to take partial or full withdrawals from their TSP accounts.  To effectuate such a withdrawal, which is referred to as an age-based, in-service withdrawal, the employee must complete a "Form TSP-75."

## E.      The Broker Dealer's Required Procedures to Purchase a Variable Annuity

30.      Before a registered representative of the Broker Dealer could sell a variable annuity through the Broker Dealer, the firm's Written Supervisory Procedures and Advisor Compliance Manual (collectively, "Compliance Procedures") required a retirement account to be opened in the customer's name at the Broker Dealer that would ultimately be linked to the variable annuity contract (sometimes called a "tracking account").

31.    The registered representative was required to open a tracking account in the Broker Dealer's new account system, which, in turn, required the registered representative to enter certain information about the proposed account holder, including the information requested in the Broker Dealer's "Account Application."

32.    After the tracking account was opened, the registered representative was then required to enter certain information concerning the variable annuity order into the Broker Dealer's Annuity Order Entry ("AOE") system, including the date on which the registered representative sent the variable annuity prospectus to the customer.

33.    During much of the Relevant Period, the AOE system generated related transaction forms that the variable annuity customer was required to sign, including a four-page form entitled, "Important Information Regarding Your Variable Annuity" (the "Variable Annuity Form").

34.    The variable annuity order was then to be submitted in the AOE system for a suitability review and approval by the OSJ manager or the manager's designated principal, and then submitted to the carrier.  The carrier then issued the variable annuity contract and sent a bound copy to the registered

representative with instructions that he or she deliver the contract to the customer.

35.    The registered representative was then required to obtain a signed delivery receipt from the customer, send the customer-signed receipt to the carrier, and preserve copies in the customer file at the Broker Dealer.

**F.    The Fraudulent Scheme to Sell Variable Annuities**

     *1.    Defendants Target Federal Employees With Sizeable TSP Accounts for Variable Annuity Purchases*

36.    Contrary to disclosures made to the Broker Dealer concerning the scope of FEBC's activities, Defendants sold approximately 200 variable annuities (with a total face value of over approximately $40 million) to approximately 200 FEBC-prospected federal employees who used funds from their TSP accounts to purchase these annuities.

37.    Hood and Long received commissions on each variable annuity they sold.  Laws and Cooke received a share of the associated commissions earned on each variable annuity sold by Hood and Long.

38.    To identify prospective customers for the sale of variable annuity products, the Representatives and/or FEBC administrative staff acting at the

direction of Laws and Cooke, used various internet sources and subscribed to various proprietary databases to obtain personal information about federal employees.

39.     Through mailed surveys, FEBC employees scheduled and conducted initial "benefits review" sessions with federal employees, which involved a review of the federal employee's life, health, disability insurance plans, and, based on salary information provided by the federal employees, their projected payouts from the federal retirement system.

40.     Interested federal employees who were eligible to roll over TSP account funds to a qualified plan on a tax-free basis were referred to one of the Representatives for "TSP counseling" services.

41.     In the course of the TSP "counseling" sessions, the Representatives obtained from the federal employee information concerning his or her years of federal service, planned retirement date, risk tolerance, net worth, and salary.

42.     During an online meeting, the federal employee was shown a slide presentation, based on a template created by Laws, Cooke and Hood, describing options for federal employees' TSP accounts upon retirement.

43.     Laws and Cooke trained Hood and Long on how to conduct the TSP counseling sessions and what to tell customers during these TSP counseling sessions to induce them to purchase variable annuities.

44.     Furthering the perception that they were affiliated with the federal government and/or the TSP rather than the Broker Dealer, Hood and Long, acting under Laws' supervision, knowingly disregarded the Broker Dealer's Compliance Procedures by conducting securities-related communications with federal employees via their FEBC's email addresses, rather than through the Representatives' Broker Dealer email addresses.

45.     Contrary to the Broker Dealer's Compliance Procedures, the Representatives failed to provide the Broker Dealer with their securities-related emails and paper correspondence with federal employees who were solicited by FEBC for variable annuity sales.

    2.     _Defendants' Misleading TSP Report_

46.     After the online meeting, Defendants generated a "TSP Report" based on a template created primarily by Laws and Cooke with contributions from Hood.  As trained by Laws and Cooke, Hood and Long then sent these TSP Reports to the targeted federal employees.

47.     During much of the Relevant Period, approximately three to four pages of each TSP Report contained personalized information, including the federal employee's name, age, TSP account value, and TSP account allocation. The remaining pages were largely the same for each federal employee to whom they were disseminated.

        a.     <u>The TSP Report Misleadingly Portrays the Recommended Investment Option as Related to or Approved by the TSP</u>

48.     The TSP Reports routinely recommended an investment option characterized in the reports as the "TSP-75 Election," "Hybrid Option," and "TSP-75 Hybrid."

49.     The names used in the TSP Reports to describe the recommended investment option—that is, "TSP-75 Election," "Hybrid Option," and "TSP-75 Hybrid"—were strikingly similar to the official form that federal employees use for age-based, in-service withdrawals—the Form TSP-75.

50.     During much of the Relevant Period, the TSP Reports contained multiple diagrams that misleadingly depicted the so-called "TSP-75 Election," "Hybrid Option," or "TSP-75 Hybrid" as related or comparable to the TSP's life annuity.

51.    The TSP Reports did not explain that the recommended investment was actually a variable annuity.  Indeed, the phrase "variable annuity" does not appear at all in the TSP Reports that Defendants generated and sent to multiple customers.

52.    In comparing the features of the TSP's life annuity with the recommended "TSP-75 Election," "Hybrid Option," or "TSP-75 Hybrid," the TSP Report identified the carrier for each option, but did not reveal that the carrier for the recommended investment had not been selected or specifically vetted by the TSP or the federal government.

53.    Additionally, the TSP Reports fostered the misleading impression that FEBC and the Representatives were employed by, contracted by, specifically vetted by, or especially approved by the federal government to advise federal employees on the TSP.

54.    Specifically, the TSP Reports described FEBC as a "national consulting group dedicated to educating federal employees," and stated that FEBC's counselors "receive extensive training in . . . all the alternative benefit programs available to federal employees."  The TSP Reports also depicted an

eagle-encircled insignia in red, white and blue colors, similar to the federal seal used by several federal agencies.

          b.     <u>The TSP Report Misleads as to the Costs of the Recommended Investment</u>

55.    The TSP Reports also made misleading statements regarding the additional benefits associated with the recommended "TSP-75 Election," "Hybrid Option" or "TSP-75 Election" as compared to the TSP's life annuity, without disclosing the significantly higher costs associated with these additional benefits.

56.    Specifically, the TSP Reports depicted the "TSP-75 Election," "Hybrid Option" or "TSP-75 Election" as having "features" not included in the TSP's life annuity, such as liquidity, investment flexibility, and longevity protection.

57.    The TSP Reports failed, however, to disclose that these additional features came at considerable additional costs as compared to the life annuity from the TSP's annuity vendor or the federal employee's taking monthly payments from his or her TSP account upon retirement.

58.     These undisclosed additional costs include mortality, expense, and administration fees of 1.3 percent annually, a rider fee of 1.25 to 1.5 percent annually, and a surrender-fee schedule requiring the customer to surrender up to 8.5 percent of any funds withdrawn from the investment during the first seven years (thereby, limiting the "liquidity" feature touted therein).

c.     The TSP Report Misleadingly Depicts the Value of the Variable Annuity

59.     The TSP Reports also contained charts that misleadingly obscured the relationship between the underlying "account value" of the variable annuity and the "benefit-base value" or the "income-base value" of that investment.

60.     The "account value" of a variable annuity is the actual value of the variable annuity subaccounts, which is where the money is actually invested, and grows on a tax deferred basis.  The account value fluctuates with corresponding gains and losses in the subaccount investments, and could be lower than the initial investment.

61.     The so-called "TSP-75 Election," "Hybrid Election" or "TSP-75 Hybrid" offered and sold by Defendants involved an investment in a variable annuity with a rider providing the following features: a guaranteed minimum

withdrawal benefit, guaranteed lifetime income, a guaranteed annual seven-percent "bonus," and annual step-ups.

62.     In this context, the "benefit-base value" or the "income-base value" is the accounting entry used to calculate the minimum guaranteed amount the annuitant can withdraw as income each year.  The benefit-base/income-base value has no cash value and, thus, is not what customers receive if they cash out of their variable annuity.

63.     The rider associated with the "TSP-75 Election," "Hybrid Election" or "TSP-75 Hybrid" guaranteed that the benefit-base value would grow seven percent annually, regardless of the market performance of the subaccounts comprising the account value.

64.     The charts in the TSP Reports failed to depict clearly that during the first seven years of the investment (that is, the surrender period), the investor was not entitled to the benefit-base value (guaranteed to grow seven-percent annually), but was only entitled to the account value minus a surrender fee.  The account value could have decreased significantly from the initial amount invested.

### 3.   *Defendants' Misleading TSP-75 Election Form*

65.   After a customer elected the so-called "TSP-75 Election," "Hybrid Option," or "TSP-75 Hybrid" upon Defendants' recommendation, Defendants assisted with the related mechanics of transferring funds from the customers' TSP accounts to purchase the variable annuity and, unbeknownst to at least five customers, open accounts at the Broker Dealer to effectuate the purchase of the variable annuity.

66.   To accomplish these feats, Defendants had the customers complete a form that Defendants created, the "TSP-75 Election Form."  While the "Elections Forms" given to customers varied to some degree depending on the Representative who sent them, these forms included pages from the official Form TSP-75 (to facilitate the in-service, age-based withdrawal from the TSP) combined with pages from Broker Dealer-specific forms (to open tracking accounts at the Broker Dealer), or combined with a page that was graphically similar to pages from the official Form TSP-75 and requested information needed to open a tracking account at the Broker Dealer in the customers' names.

67.   Laws and Cooke trained and/or instructed Long and Hood on which pages of the Form TSP-75 and Broker Dealer-specific forms the Representatives

were "required" to send federal employees to effectuate the variable annuity purchase.

68.     The participant signature page of the official Form TSP-75, which was included in the "Election Forms," indicates that the form must be notarized by a notary public.

69.     Laws improperly notarized the signature of at least one customer without (1) personally witnessing the customer sign the relevant pages of the Form TSP-75, (2) confirming with the customer via telephone or email communication that he/she had indeed signed these pages, or (3) obtaining copies of a government-issued identification from the customer to compare the signature affixed thereon to the signatures on the relevant pages of the Form TSP-75.

         a.    Long's Election Forms

70.     The "TSP-75 Election Form" that Long sent to certain federal employees consisted of five pages excerpted from the official Form TSP-75 and three pages excerpted from the Broker Dealer's Account Application.

71.     Long's "TSP-75 Election Forms" included a cover page similar in appearance to that of the official Form TSP-75, including the TSP insignia

printed to the left of the words "Thrift Savings Plan."  But the words "Age-Based In-Service Withdrawal Request" that appeared on cover page of the official Form TSP-75 were replaced with the words "Election Forms."

72.    Long's Election Forms omitted the instruction pages that were included in the official Form TSP-75.  In addition, these Election Forms omitted the page of the official Form TSP-75 directing the completed form to be sent directly to the TSP, and replaced it with a graphically similar-looking page instructing that the completed form instead be sent directly to FEBC.

73.    None of the pages included in these Election Forms disclosed that the customer would be opening an account at the Broker Dealer (and not with the TSP or the carrier of the annuity).

b.    Hood's Election Forms

74.    Hood sent a slightly different version of a so-called "TSP-75 Election Form" to several federal employees.  This form included a cover page similar in appearance to the cover page of the official Form TSP-75, including the TSP insignia printed to the left of the words "Thrift Savings Plan."  But the words "Age-Based In-Service Withdrawal Request" on the cover page of the official Form TSP-75 were replaced with the words "Election Form."

-23-

75.    Following the cover page, the "Election Form" sent by Hood to multiple customers included three information-requesting pages taken from the official Form TSP-75, including section headings numbered I through IX.  But this "Election Form" also included an additional page designed to appear indistinguishable from, and as a continuation of, the three pages taken from the official Form TSP-75.

76.    For example, the first information-requesting section of the additional page in the election form sent by Hood was numbered X, thereby appearing as a continuation of section IX from the official Form TSP-75.  The additional page also used the same font types and sizes, page borders, page header, and date-edition designation in the footer as the prior three pages that were taken from the official Form TSP-75.

77.    The additional page in the election form sent to multiple customers by Hood requested the type of personal information requested in the Broker Dealer's Account Application, including, for example, driver's license number, beneficiary designations, and employer's address.  None of this information was requested on any pages of the TSP's official Form TSP-75 in effect during the Relevant Period.

78.     As with the so-called "Election Forms" sent by Long, the "Election Forms" sent by Hood omitted the instruction pages included in the official Form TSP-75.

79.     Hood instructed federal employees to sign and return the so-called TSP-75 Election Form to FEBC, rather than directly to the TSP, in order to effectuate their so-called TSP-75 election.

   4.   *Additional Actions Masking the Distinctions between Defendant and their Recommended Investment versus the TSP and Its Life Annuity*

       a.   Surreptitiously Opening Tracking Accounts

80.     Hood and Long opened tracking accounts at the Broker Dealer for at least five customers without those customers' knowledge or consent.

81.     To open these accounts, Hood and Long used the information they obtained from the customers, either from oral communications or from the Election Forms that the customers completed.

82.     For multiple customers, Long, or others at FEBC acting on his behalf, combined the signature page of the Broker Dealer's Application Form that was included in Long's "Election Forms" that these customers signed with the other pages an Application Form that these customers never received.

83.     For multiple customers, Hood, or others at FEBC acting on his behalf, copied and pasted the signatures of certain customers from pages they actually signed onto the signature page of an Account Application that these customers never received.

84.     By opening the tracking accounts in these customers' names without these customers' prior knowledge or consent, Hood and Long reduced the possibility that these customers would discover that they and FEBC were affiliated with a broker dealer, were not affiliated with or specifically approved by the federal government, and the investment option these customers had selected was a variable annuity issued by a private insurance company that was not specifically selected by, vetted by, or in any way affiliated with the TSP.

        b.    <u>Failure to Timely Provide Customers with Prospectuses or the Complete Variable Annuity Form</u>

85.     Pursuant to the Broker Dealer's Compliance Procedures, before submitting a variable annuity order in the Broker Dealer's AOE system for review and approval, a registered representative was required to send the customer a product prospectus and obtain the customer's signature on the Broker Dealer's Variable Annuity Form.

86.   Contrary to these procedures, Hood and Long did not send a prospectus to multiple customers.

87.   Instead, Hood and Long falsely reported in the Broker Dealer's AOE system that they had sent theses customers a prospectus on dates occurring before these customers' TSP account funds were sent to the carrier.

88.   For multiple customers, Hood did not send, or obtain the valid signatures and initials on, the Broker Dealer's Variable Annuity Form before submitting these customers' variable annuity orders in the Broker Dealer's AOE system for review and approval.

89.   Instead, Hood, or others at FEBC acting on his behalf, copied and pasted the signature of at least one customer from other forms this customer had signed earlier onto the Broker Dealer's Variable Annuity Form, which this customer had never received.

90.   Long did not obtain the initials and signatures of multiple other customers on the Broker Dealer's Variable Annuity Form before submitting their respective variable annuity orders in the Broker Dealer's AOE system for review and approval.  Rather, Long, or others at FEBC acting on his behalf, sent these customers only two pages of the four-page Broker Dealer's Variable Annuity

Form—the two pages requiring the customer's initials and the signature—after their TSP accounts funds had already been sent to the annuity carrier and an annuity "contract" was generated in their respective names.  Long never sent these customers the pages of this Variable Annuity Form that listed the full name of the variable annuity product, delineated the associated fees and surrender-fee schedule, and set forth the date on which the customer was purportedly provided the prospectus.

91.    Through these actions, Hood and Long were able to facilitate the suitability review and approval of these transactions by the designated principal assigned to the Alpharetta OSJ.

92.    After the variable annuity carrier had approved a variable annuity purchase facilitated by Defendants, the carrier mailed a bound copy of the customer's annuity contract along with a delivery receipt and, if applicable, a client acknowledgement form, to one of the registered representatives of record for the transaction with instructions that the registered representative send the contract packet to the customer.

93.    Defendants did not send the bound contract to multiple variable annuity customers.

94.    By failing to provide multiple customers with prospectuses, the complete version of the Broker Dealer's Variable Annuity Form, and the annuity contract, Defendants reduced the possibility that these customers would discover that the investment option they had selected was a variable annuity issued by a private insurance company that was not specifically selected by, vetted by, or in any way affiliated with the TSP.

    5.    *Oral Misrepresentations and Omissions Made By Hood and Long*

95.    Hood and Long made oral misrepresentations and omissions to multiple customers in connection with the sale of variable annuities.

96.    Hood and Long tailored their oral representations to these customers based on those customers' financial sophistication and the specific questions they asked, making the minimal disclosures necessary to attain each particular customer's assent to the subject investment.

97.    For example, Hood told at least one customer that he was a counselor with the TSP.

98.    Long told at least one customer that roughly one third of government employees go into the so-called "TSP-75 Election."

99.   Hood and Long did not orally clarify to multiple customers the misleading statements and omissions in the TSP Reports concerning the recommended investment's lack of government affiliation or specific selection and the Representatives' lack of government affiliation.

100.   For example, although one customer repeatedly told Long that she could not believe that the government offered the so-called "TSP-75 Election" depicted in the TSP Report, Long never clarified that the investment was not being offered by the federal government.

101.   These misrepresentations and omissions by Hood and Long further contributed to the belief by certain customers that the recommended investment was offered, vetted, or specifically selected by the TSP and that the Representatives and FEBC were employed by, contracted by, vetted by, or specifically approved by the federal government.

102.   Hood and Long told multiple customers that the recommended investment guaranteed a seven-percent annual return.  But they failed to explain to these customers that this guarantee applied only to the benefit-base value of the recommended investment and that their actual account value would fluctuate with the stock market.

103.   Hood and Long each misrepresented the annual fees associated with the recommended investment to at least one customer.

104.   For example, although the total annual fees for the variable annuity purchased by one such customer included a mortality, expense, and administration fees of 1.3 percent and a rider fee of 1.25 to 1.5 percent, Long told this customer that the total fee was under one percent and a tiny bit more than the TSP.

105.   And Hood told at least one other customer that the annual fees associated with the recommended investment were only 1.5 percent.

106.   Moreover, Hood and Long misled multiple customers about the seven-year surrender-fee schedule associated with the recommended investment.

107.   For example, Long told at least one customer that there was a seven-year period of marginal and acceptable penalties for early withdrawal, but he failed to disclose to this customer that such penalties included up to 8.5 percent of the invested amount.

108.   And Hood told at least one customer that her investment was guaranteed to grow seven-percent annually as long as she did not touch the money in the first four years.

109.   As a result of Hood's and Long's omissions and misrepresentations, at least five customers did not understand the true nature of their investment, including the significant fees, until after their TSP account funds had been liquidated and sent to the variable annuity carrier.

## COUNT I
### (All Defendants)

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

110.   The Commission realleges paragraphs 1 through 109 above.

111.   Between approximately March 2012 and November 2014, Defendants in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

112.   Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

113.   While engaging in the course of conduct described above, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

114.   By reason of the foregoing, Defendants indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II
### (FEBC, Hood, and Long)

### Violations of Section 17(a)(2) and (a)(3) of the Securities Act
### [15 U.S.C. § 77q(a)(2) and (a)(3)]

115.   Paragraphs 1 through 109 are hereby realleged and are incorporated by reference.

116.   Between approximately March 2012 and November 2014, Defendants FEBC, Hood, and Long, in the offer and sale of securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

    a.   obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b.      engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

117.   Defendants FEBC, Hood, and Long, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III
### (Laws and Cooke)

### Violations of Section 17(a)(3) of the Securities Act
### [15 U.S.C. § 77q(a)(3)]

118.   Paragraphs 1 through 109 are hereby realleged and are incorporated by reference.

119.   Between approximately March 2012 and November 2014, Defendants Laws and Cooke in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, engaged in

transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

120.   By reason of the foregoing, Defendants Laws and Cooke directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

**COUNT IV**
**(FEBC, Hood, and Long)**

**Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**
**[15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5]**

121.   The Commission realleges paragraphs 1 through 109 above.

122.   Between approximately March 2012 and November 2014, Defendants FEBC, Hood and Long, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

      a.     employed devices, schemes, and artifices to defraud;

      b.     made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not

misleading; and

c.      engaged in acts, practices, and courses of business which

would and did operate as a fraud and deceit upon the purchasers of

such securities,

all as more particularly described above.

123.   Defendants FEBC, Hood, and Long knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, Defendants FEBC, Hood, and Long acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

124.   By reason of the foregoing, Defendants FEBC, Hood, and Long, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT V
**(Laws and Cooke)**

**Violations of Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act
[15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5(a) and (c)]**

125.    The Commission realleges paragraphs 1 through 109 above.

126.    Between approximately March 2012 and November 2014,
Defendants Laws and Cooke, in connection with the purchase and sale of
securities described herein, by the use of the means and instrumentalities of
interstate commerce and by use of the mails, directly and indirectly:

a.    employed devices, schemes, and artifices to defraud; and

b.    engaged in acts, practices, and courses of business which would and
did operate as a fraud and deceit upon the purchasers of such
securities,

all as more particularly described above.

127.    Defendants Laws and Cooke knowingly, intentionally, and/or
recklessly engaged in the aforementioned devices, schemes and artifices to
defraud, made untrue statements of material facts and omitted to state material
facts, and engaged in fraudulent acts, practices and courses of business.  In
engaging in such conduct, Defendants Laws and Cooke acted with scienter, that

is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

128.   By reason of the foregoing, Defendants Laws and Cooke directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) & (c)].

<u>**COUNT VI**</u>
**(Laws and Cooke)**

**Aiding and Abetting Violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

129.   Paragraphs 1 through 109 are hereby re-alleged and are incorporated herein by reference.

130.   Between approximately March 2012 and November 2014, Defendants Laws and Cooke knowingly or recklessly provided substantial assistance to Defendants FEBC, Hood and Long's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5], and therefore are liable as aiders and abettors.

131.   Unless restrained and enjoined, Defendants Laws and Cooke will continue to aid and abet FEBC, Hood, and Long's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT VII
**(Laws and Cooke)**

**Liability under Section 20(a) of the Exchange Act for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**
**[15 U.S.C. §§ 78t(a)]**

132.   Paragraphs 1 through 109 are hereby re-alleged and are incorporated herein by reference.

133.   Pursuant to Section 20(a) of the Exchange Act, Defendants Laws and Cooke by, directly or indirectly, controlling Defendants FEBC, Hood and Long, are liable for their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## COUNT VIII
### (Laws, Cooke, Hood, and Long)

### Aiding and Abetting Violations of Section 17(a) of the Exchange Act and Rule 17a-4(b)(4) thereunder

134.   Paragraphs 1 through 109 are hereby re-alleged and are incorporated herein by reference.

135.   Between approximately March 2012 and November 2014, Defendants Laws, Cooke, Hood, and Long knowingly or recklessly provided substantial assistance to the Broker Dealer's violations of Section 17(a) of the Exchange Act [15 U.S.C. § 78q(a)] and Rule 17a-4(b)(4) thereunder [17 C.F.R. § 240.17a-4(b)(4)], and therefore are liable as aiders and abettors.

136.   Unless restrained and enjoined, Defendants Laws, Cooke, Hood, and Long will continue to aid and abet the Broker Dealer's violations of Section 17(a) of the Exchange Act [15 U.S.C. § 78q(a)] and Rule 17a-4(b)(4) thereunder [17 C.F.R. § 240.17a-4(b)(4)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

### I.

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that the Defendants named herein committed the violations alleged herein.

### II.

Permanent injunctions enjoining Defendants from violating, directly or indirectly, or aiding and abetting violations of the laws and rules alleged in this complaint.

### III.

An order requiring the disgorgement by Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

### IV.

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] imposing civil penalties against Defendants.

**V.**

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

**JURY TRIAL DEMAND**

The Commission hereby demands a jury trial as to all issues so triable.

This 31 day of July, 2017.

*/s/ M. Graham Loomis*
M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

Kristin W. Murnahan
Senior Trial Counsel
Georgia Bar No. 759054
murnahank@sec.gov

United States Securities & Exchange Commission
950 E. Paces Ferry Road NE
Suite 900
Atlanta, GA 30326
404-842-7600